# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 30, 2007 Session

## STATE OF TENNESSEE V. ALGIE LAVELL McCLURE

**Appeal from the Criminal Court for Hamilton County**
**No. 248290      Rebecca Stern, Judge**

---

**No. E2007-02556-CCA-R3-CD Filed March 26, 2008**

---

The defendant, Algie Lavell McClure, appeals as of right his jury convictions in the Hamilton County Criminal Court for first degree premeditated murder, first degree felony murder, reckless endangerment, and aggravated burglary. The trial court imposed Range I sentences of two years and three years for the reckless endangerment and aggravated burglary counts, respectively. The two year sentence is to be served consecutively to the life sentence for the merged first degree murder conviction, with all other sentences to be served concurrently. The defendant contends on appeal that there is insufficient evidence to support his convictions, that the trial court erred in admitting evidence of numerous prior bad acts of the defendant through multiple witnesses, that the trial court erred in admission of impeachment evidence, and that the trial court erred by not giving a credibility instruction relative to expectations of favorable treatment certain witnesses may have had in exchange for their testimony.[1]  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P.  3 Appeal as of Right;  Judgments of the Criminal Court are Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and DAVID G. HAYES, JJ., joined.

John McDougal (at trial) and Lloyd A. Levitt (on appeal),attorneys for appellant, Algie Lavell McClure.

Robert E. Cooper, Jr., Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; William Cox, Jr., District Attorney General; Boyd Patterson and Bates Bryan, Assistant District Attorneys General, attorneys for appellee, State of Tennessee.

---

[1] The defendant's brief also lists two other issues related to the state's alleged failure to provide discovery and the preclusion of a conviction for especially aggravated burglary in conjunction with the first degree murder convictions both of which the defendant now concedes are moot, abandoning them in the argument portion of his brief.

# OPINION

The defendant's convictions arise from the forced-entry shooting death of Antonius Tuggle and injury to his girlfriend, Latasha Hinton, that occurred at Tuggle's home on December 23, 2003. The defendant became a suspect based upon his association with the victim, their pending prosecutions as codefendants in a drug case, and reported threats made by the defendant to the victim regarding his urging the victim to take the blame in the drug cases.

Detective Phillip Steven Narramore of the Chattanooga Police Department testified that he executed a search warrant of the defendant's residence on August 30, 2002, where he found numerous handguns, drug trafficking equipment, and large sums of money as well as large amounts of cocaine, crack cocaine, marijuana and Ecstasy. The defendant, the victim, and Edward Nunn were sitting in the kitchen in close proximity to where the items were found. Detective Narramore testified that the defendant was facing a "significant amount of time on [the] state level or federal level" if convicted for the drug offenses.

Mark "Little Man" Calhoun testified that the victim was his best friend for about six or seven years. He stated that he knew about the drug bust and that some time later, the victim received a phone call to come talk to the defendant. When they arrived at the Buster Brown Apartments to meet the defendant, Calhoun stated that the defendant and the victim argued about the pending drug prosecution. He recalled that the defendant told the victim that the victim "needed to take care of the case . . . to clear [the defendant's] name because [the defendant] was already in enough stuff." Calhoun testified that the victim told the defendant that he would claim what was his part in the drug case but refused to take all the responsibility. Calhoun stated that the argument went on for some time and ended with the defendant telling the victim, "well, I'm going to handle this in my own hands," which Calhoun understood to mean "no witnesses, no case." Calhoun also testified regarding a similar incident that occurred at the B & B Market. He stated that the defendant again threatened to "handle it in the streets" when the victim refused to take the blame for the drugs. Calhoun testified that, after the shooting death of the victim, the defendant saw him on Greenwood Drive and told him, "I'll get you too."

Kenya Houston testified that she was the victim's girlfriend in August 2002 when the drug arrests occurred. She recalled several arguments between the defendant and the victim regarding the defendant's attempts to get the victim to take the full blame for the drugs. She stated that the victim "was only going to accept charges for what he had, his things." On cross-examination, Houston acknowledged that she never heard the defendant threaten the victim and added that she did not know if the victim was afraid of the defendant but that "[h]e didn't like having the conversations." She also stated that the defendant was not normally a threatening individual. After making this statement, the state confronted her with her prior statement to Detective Irwin that the defendant is the kind of person who "just [does not] deal with problems that he [does not] have to deal with. If he has to shoot you or what he feel[s] like he [has] got to do to take care of the problem, I know he will do that." She also acknowledged that she had previously told the police that the defendant is

-2-

"known for using violence against people, shooting to hurt people" and that he is "feared a lot by some people."

Monica Preston testified that she lived next door to the victim in a duplex when the shooting occurred. She recalled that she was asleep at around 9:00 p.m. when her daughters came into her room because they had heard a loud thump at the victim's residence. She went to the kitchen and heard something that sounded "like a firecracker" at least two times. She looked out her window, but she did not see anything unusual. She heard a woman screaming but assumed that the victim and his girlfriend were arguing so she went back to bed. She did not realize what had happened until the police arrived.

Christie Rhodes was a store clerk at B & B Market in late 2003. She knew the victim as a frequent customer of the store. She witnessed an altercation between the defendant and the victim. When she heard loud yelling out in the parking lot she looked out the window to see the victim grab the defendant and "shove him up against the window of the store." She could not understand what they were saying but could tell by their actions that they were arguing. She went to the door and told them that they could not be fighting in the parking lot, so they stopped and nothing further happened. She stated that both men came into the store together to apologize to her for scaring her.

Thomas Trotman testified that he was a recovering crack cocaine addict and a resident of the Hamilton County Jail. He stated that the defendant had hired him to do some work around his house about two and half years ago. About three months after beginning to work for the defendant, drug task force members approached Trotman with hopes that he would "wear a wire and try to make a buy off" the defendant. He declined the task force's offer and later told the defendant about the meeting because he "didn't feel good about it." A few months later, the defendant told Trotman that he appreciated what he had done by not working with the task force. Trotman testified that the defendant also told him that the narcotics detectives had told the defendant that the victim was "telling on him." Trotman acknowledged that he had prosecutions pending at the time of his testimony, but he stated that he had been promised nothing in exchange for his testimony and was only there because he had been subpoenaed.

Brian Herman, a federal prisoner serving a twenty-three year sentence for drug offenses, testified that he has known the defendant about ten years. He recalled that the defendant's girlfriend contacted him for bail money when the defendant was arrested in August 2002. After the defendant made bail, the defendant and Herman met for dinner. In reference to the drug case, Herman testified that the defendant told him, "[t]hese bitches always want to hop up on the stand, we need to start killing these bitches. [The victim] thinking he [is] going to make it [to] trial, you know, he ain't going to make it to trial. I'm going to make sure he [is] dead before trial, either I [will] or I'll have somebody to do it." Later that night, Herman and the defendant ran into the victim at a party. After talking to the victim, the defendant told Herman, "[m]an, he ain't acting right . . . . He needs to just step up and take this charge before the feds get it. You know, if he [does not] take this charge, I'm going to be messed up. You know, he ain't going to make it to trial." On yet another occasion, when Herman went to the defendant's home to buy a puppy, the defendant told Herman that the victim

-3-

would not make it to trial and threatened, "I'll make sure he's dead before he get[s] a chance to testify." Herman also testified that he had seen the defendant with many guns during the course of their friendship and that a Glock pistol was his favorite.

Herman testified that he only wanted to tell the truth with no expectation or promise of any deal, although he did have hopes of "[m]aybe a leaner sentence." He acknowledged that his guilty plea in federal court included language that if he rendered "substantial assistance" to the government he could be recommended for a downward departure in the length of his sentence. He reiterated that he had been promised nothing, but he admitted that he was testifying in other matters in Hamilton County Criminal Court in hopes of receiving a downward departure based upon substantial assistance. On redirect examination, Herman stated that if he testified untruthfully he would risk an increase in his sentence and that he had lost a friend in the defendant by testifying truthfully at the trial.

Latasha Hinton, the victim's girlfriend at the time of his murder, testified that she dated the victim for about six or seven months. She realized he was a "dope dealer" about two or three months into the relationship based upon the traffic in and out of the apartment and the phone calls he regularly received. She said that she knew the defendant through the victim but had only seen him a few times before the murder. She recalled a conversation between the two men when the defendant accused the victim of talking to the police, an accusation the victim denied. Although she never heard any specific threats, she stated that the victim was upset by the conversation. She testified that on the night of December 23, 2003, as she and the victim were getting ready for bed, she heard a loud boom. The victim ran to the front door and Hinton followed behind him. She testified that the defendant pushed in the door and shot them both. She recalled that the victim attempted to wrestle the gun from the defendant after he had been shot. The defendant continued shooting the gun as they wrestled. The defendant started to leave but when the victim got back up, the defendant came back into the apartment and shot the victim again. Hinton was screaming hysterically and the defendant turned and shot at her two or three times, hitting her once in the hip. After she was shot, she looked at the victim and realized that he had his own revolver and was attempting to shoot the defendant. At his point, the defendant fled the apartment. Hinton admitted to testifying previously that she had no knowledge of any drugs in the house, but at trial she testified that she "cleaned up [the] dope, weed and money" by throwing it in the backyard after calling 911. She denied telling the police that they were shot by two masked men, but she admitted that she did not name the defendant because she could not remember his name when she gave her initial statement.

Chattanooga Police Department Officer Jamie Riddle testified that she was dispatched to the scene of the homicide on December 23, 2003. Upon arrival, she and another officer noticed that the front door to the residence had been kicked in. They also saw the victim rolling on the living room floor with a gunshot wound to his chest. Officer Riddle testified that a hysterical woman later identified as Hinton came running down the hallway and they ordered her to the ground while they secured the scene and radioed for emergency medical services. Officer Riddle began CPR on the victim but he died in "less than a minute." Hinton told the officers that two black men kicked the door in and took off. Officer Riddle stated that Hinton acted "very vague and [would] just try to get

[her] attention somewhere else" when asked questions regarding the suspects' descriptions. On cross-examination, Officer Riddle recalled that Hinton did not name anyone when asked who had shot them. She also stated that a revolver with one empty casing was found in the hallway.

Crime Scene Investigator Gregory Mardis of the Chattanooga Police Department testified that he collected thirty-eight separate items from the crime scene, including bags of narcotics and cash. Investigator Mardis identified photographs of bloodstains in the kitchen, hallway, and on the victim's socks. He also identified photographs of tire tracks found at the scene, evidence of the kicked in front door, marijauna, and drug paraphernalia found in the residence and in the backyard. Several nine millimeter and.45 caliber shell casings were found in the residence. He acknowledged on cross-examination that an examination of the tire tracks was nonproductive and that no fingerprint evidence or gunshot residue analysis was performed on evidence at the crime scene. The crime scene examination revealed six shots from a nine millimeter handgun and one shot from the .357 handgun that was found at the scene.

Tom Layne of the Chattanooga Police Department testified that he was a patrol supervisor in December 2003 and responded to the call regarding the shooting. Upon his arrival, he confirmed that the scene was secure and began assisting in the treatment of the victims. He recalled sending Hinton's description of the suspects to dispatch for a city wide bulletin and that it only referred to two black males with no reference to masks or any other clothing.

Chattanooga Police Department Crime Scene Investigator Tracy McGhee testified regarding the condition of the scene. He described the locations of bullet holes, bullets and shell casings found throughout the apartment. He also described where blood evidence was found in the apartment. Investigator McGhee stated that no latent fingerprint evidence was found at the scene.

Doctor Frank King testified in his capacity as the Hamilton County Medical Examiner regarding the victim's injuries and cause of death. Testifying from the report of Dr. Stan Kessler, a board certified pathologist working in the Hamilton County Medical Examiner's Office at the time of the victim's autopsy, Dr. King concluded that the victim suffered gunshot wounds to his chest and right hip. Dr. King testified that the victim died as a result of hemorrhaging from the wounds, particularly the chest wound. He concluded, however, that either wound would have been fatal.

Don Carmen with the Tennessee Bureau of Investigation testified that he performed ballistics testing on evidence recovered at the scene. His testing confirmed that the .38 caliber ammunition recovered at the scene had been fired from the .357 magnum Taurus revolver. Testing also revealed that the nine millimeter ammunition was not fired from the nine millimeter semi-automatic pistol found at the scene. Carmen explained that although the nine millimeter ammunition had been fired by the same pistol, it was not fired from the pistol submitted for his examination. He also examined two .45 caliber bullets that were recovered and determined that they had been fired from the same .45 caliber pistol. Such a pistol was not found during the investigation. Therefore, Carmen concluded that three firearms were involved in the offense.

Charles Hardy testified as an expert in serology employed by the TBI Crime Lab. A comparison of samples taken from the victims and the blood stain evidence recovered at the scene revealed that blood stain evidence from the living room, hallway, and bedroom door frame matched the sample from Tuggle. The blood stain evidence from the laundry room and backdoor step matched the sample from Hinton.

Kordell Butler testified that he is a federal inmate serving his tenth year of a fifteen year sentence for felony possession of a firearm and drug distribution. He stated that he met the defendant while at the Hamilton County Jail awaiting to testify in an unrelated murder prosecution. While the two men were housed together in an isolation cell, the defendant related to Butler what happened the night of the offense. Butler testified that he led the defendant to believe that he was also awaiting trial for a murder. Through the course of their conversations, the defendant told Butler that "he do[es] dome shots," meaning that the defendant preferred to shoot victims in the head but not the chest. During one conversation, Butler told the defendant "man, you know you killed that guy." Butler claimed that the defendant indicated that he had killed the victim but added that "the only thing they got is the bitch," referring to Hinton being the primary state witness. Butler testified that a few weeks later he asked the defendant what happened and he told Butler that "he kicked the door in, shot the guy and the girl and some kind of way the guy got back up, got a gun and started shooting at him and he ran out." Butler also testified that he overheard the defendant on the telephone preparing an alibi regarding a trip to a Walgreens. Butler acknowledged that he contacted the district attorney general in hopes of a reduced sentence, but he also stated that he had never been promised anything for his testimony.

Seneka Gaines testified that her sister, Latasha Hinton, spoke to her as she was going into surgery on the night of the offense. She related that Hinton told her that Tuggle was in the living room and that she was in the kitchen when the defendant kicked in the door and began shooting, contrary to Hinton's testimony that they were both in the back bedroom when the defendant entered the apartment. A portion of a taped interview of Gaines taken December 24, 2003 was played for the jury wherein Gaines indicated that Hinton identified the defendant as the assailant.

Investigator Charles Martin of the Chattanooga Police Department testified that he was the lead investigator in the Tuggle homicide. Investigator Martin testified that the defendant turned himself in on January 6, 2004. He acknowledged on cross-examination that the victim's house could be considered a drug house and that it was not uncommon for residents at such places to be victimized by robberies, thefts and drug-related assaults. He also acknowledged that the defendant became a suspect based upon the interview with Gaines that indicated her sister named the defendant as the perpetrator. He added that Hinton identified the defendant from a photographic lineup at a later date.

Shawn Bailey testified for the defendant that he picked up the defendant in Nashville on December 23 and that they arrived in Chattanooga at approximately 6:45 in the evening. Bailey testified that they went to a Walgreens to pick up some medicine for his baby. While there, the defendant saw a friend and spent about twenty minutes talking to him before they left to deliver the

medicine to the defendant's baby's mother, Carmen. After staying at Carmen's home for forty-five minutes to an hour, Bailey and the defendant drove around and visited a friend, Ramon O'Neal, in the East Chattanooga and Brainerd Road area of town. Bailey testified that he dropped off the defendant at about 10:00 p.m. and that they never drove near the area where the murder took place. On cross-examination, Bailey acknowledged that he could have been on house arrest on December 23, but he added that he could have been a fugitive for violation of house arrest at that time as well.

Ramon O'Neal testified that the defendant stopped by his house at approximately 8:40 p.m. on December 23 because he was looking for an automobile title. O'Neal stated that they talked for about twelve or thirteen minutes. He recalled looking at a clock when the defendant left that reflected it was 8:56 p.m. On cross-examination, O'Neal denied speaking with the defendant as late as 9:45 p.m. He also admitted that the defendant telephoned him some time after his arrest and told him he might need to come to court to testify for him.

Wiley Render testified that the defendant called him on December 23 and asked for a ride. He could not remember the exact time but estimated that it was sometime from 8:00 to 9:30 p.m. He recalled that they spent about twenty to thirty minutes together before Render dropped the defendant off in the Brainerd Road area. On cross-examination, the state confronted Render with his prior statements that the defendant could not have telephoned him for the ride any later than 8:20 p.m. and that the defendant did not call him as late as 9:00 p.m. Once confronted with these statements, Render admitted that he really was not sure of the time but that "[i]t was late dark." On redirect, Render was even unsure of the exact date of his contact with the defendant, stating "I don't know, you know, 23rd, 24th or 22nd, you know, I'm not for sure."

Wilma Brown, the defendant's aunt, testified that the defendant visited her on the evening of December 23. She recalled that he visited at approximately 9:00. She figured the time because her son was not home from work yet but got off work at 9:00 and arrived home shortly after the defendant arrived. She stated that the defendant visited for thirty to forty-five minutes before leaving. She recalled that her son said he was leaving at about the same time, but she did not know if they went anywhere together. On cross-examination, Brown acknowledged that the defendant could not be "two places at one time" so if someone else had testified he was elsewhere at 9:00 that person was wrong.

Reginald Gilmore, the defendant's uncle, testified that the defendant came by the place he was staying on December 23 sometime between 10:00 and 11:00 p.m. and that the defendant stayed there with Gilmore all night. On cross-examination, Gilmore explained that he was staying with someone next door to Wilma Brown at the time.

Wendy Christopher testified that she met the defendant at a night club about three years prior to her testimony at trial. She also stated that she grew up in the same neighborhood as Natasha Hinton. She related a conversation with Hinton that occurred a few months after the offenses when she asked how Hinton was doing after her injuries. Christopher stated that Hinton told her that two masked men entered the home and killed her boyfriend. Christopher also testified that Hinton told

-7-

her that she did not know who the assailants were. On cross-examination, Christopher admitted that she had been convicted of theft and conspiracy to sell cocaine in the past. She also admitted that her conversation with Hinton occurred about one month after the offenses had occurred when she ran into Hinton at a gas station. She recalled that Hinton was holding hands with a small child about to put the child into a car seat and that there were two other young children already in the car. She also acknowledged that Hinton did not really know her or her cousin that well and had not seen them in several years. Christopher testified that Hinton acted like "she was keeping it real brief, that she didn't want to talk about it" when asked questions about the offenses.

The defendant denied that he had any problems with the victim and described the statements of witnesses as "just a hype everybody [was] putting out." He claimed that he never threatened the victim to take responsibility for the drug charges and never threatened any violence against the victim. He testified that the B & B Market clerk, Christie Rhodes, lied about an altercation between him and the victim. He stated that when the victim was killed he became a suspect within two days. He related that he called the police and turned himself in on January 6, about the time when court resumed in Hamilton County. The defendant testified that he returned from Nashville on December 23 and went to Walgreen's to pick up a prescription for his girlfriend. He stated that he went to Ramon O'Neal's house after taking the prescription to his girlfriend. He visited several friends during the evening because he had been out of town for about a week. He remembered getting a phone call sometime after 10:00 p.m. that the victim had been killed. The defendant denied killing the victim or having him killed.

On cross-examination, the defendant admitted that he was facing felony drug and handgun charges in the August 2002 case involving the victim. When asked if he was better off without the victim alive for trial, the defendant insisted that his case would be better with the victim alive. He also indicated that he had filed a speedy trial motion in 2002, but the case had still not gone to trial. He also indicated that he was not concerned that the victim was going to testify against him. The defendant acknowledged some inconsistencies regarding time in his alibi witnesses' testimony. He insisted that he was with Wiley Render sometime after 10:00 p.m. when he received the phone call that the victim had been shot. The defendant added that he visited with Mike Jackson and Kirk Smith after leaving Render's house and ending up at his aunt's house sometime after 11:15 p.m. The defendant also stated that he never told anyone about his alibi witnesses because, he claimed, no one would listen to him.

The state presented several rebuttal witnesses. Brandon Patterson, a pharmacy clerk at Walgreens, testified that a prescription in the defendant's girlfriend's name was picked up at 5:55 p.m. on December 23. Steven John Beluchi, a physical therapist, testified that he worked at the same therapy office where Hinton received therapy after her injuries. Although she was not his patient, Beluchi observed that in February 2004, Hinton required crutches to walk and was unable to drive a car, contrary to Christopher's testimony about her conversation with Hinton. Dr. Katie Lunn testified as an expert in physical therapy and also treated Hinton. She stated that Hinton would have been unable to walk or drive a car as described by Christopher's testimony.

ANALYSIS

*Sufficiency of the Evidence*

In his first allegation, the defendant contends that the evidence is insufficient to support his convictions for first degree murder, reckless endangerment and aggravated burglary. He argues that the only evidence directly linking him to the offenses is the testimony of Natasha Hinton which was "irreconcilable in many crucial details" and the testimony of Kordell Butler that the defendant confessed to him that he committed the crimes.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A conviction for first degree premeditated murder requires proof that the defendant committed a "premeditated and intentional killing." Tenn. Code Ann. § 39-13-202(a)(1). A conviction for first degree felony murder, as charged in the indictment, requires proof of a "killing of another committed in the perpetration of or attempt to perpetrate any . . . burglary." Tenn. Code Ann. § 39-13-202(a)(2). A conviction for reckless endangerment requires proof that the defendant "recklessly engage[d] in conduct that places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). A conviction for aggravated burglary, as charged in the indictment, requires proof that the defendant entered a home without the owner's effective consent with the intent to commit an assault. Tenn. Code Ann. § 39-14-403.

The proof at trial showed that the defendant broke down the front door of the apartment, entered the victim's home, and fired an assault weapon repeatedly, hitting both Tuggle and Hinton. Tuggle's injuries were fatal and Hinton survived but suffered permanent injury to her hip. Evidence regarding the defendant's prior threats and animosity toward Tuggle support the jury's finding of premeditation. Additionally, the defendant admitted to Kordell Butler that he committed the offenses. Accordingly, we conclude that the evidence is sufficient to support the defendant's

convictions for first degree murder - both premeditated and felony, reckless endangerment, and aggravated burglary.

As part of the defendant's challenge to the sufficiency of the evidence, he contends that the testimony of Hinton should not have been considered by the jury because it is "irreconcilable in many crucial details" concerning her identification of the defendant as the shooter and the area of the apartment in which she was shot. He claims that the "rule of cancellation" required the jury to disregard Hinton's testimony, leaving only the testimony of Kordell Butler as direct proof of the defendant's involvement in the offenses.

In State v. Matthews, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993), this court held that "contradictory statements by a witness in connection with the same fact cancel each other." The rule is typically limited to situations where the witness makes contradictory statements under oath. Furthermore, the rule "applies only when inconsistency in a witness' testimony is unexplained and when neither version of [her] testimony is corroborated by other evidence." Matthews, 888 S.W.2d at 449.

The rule of cancellation is inapplicable to the facts of this case. First, there is no indication that Hinton's prior statements to the police on the night of the incident were sworn. Additionally, Hinton explained the difficulty she had identifying the defendant to the police on the night of the incident. Also, relative to the inconsistencies concerning where in the apartment she was shot, the ballistics evidence clearly corroborated her statement that she was shot in the hallway of the apartment. Therefore, Hinton's testimony was properly considered by this jury in determining the defendant's guilt.

*Admission of Evidence of Prior Bad Acts*

The defendant makes numerous allegations of error relating to the trial court's admission of prior bad acts of the defendant involving drug activities, arguments with the victim and threats to the victim and other witnesses. Specifically, the defendant contends that the trial court should not have admitted evidence regarding the drug raid and the evidence recovered from the drug raid through the testimony of Detective Narramore. The defendant also argues that testimony regarding threatening statements he allegedly made to witnesses regarding the victim not testifying at the trial on the drug charges was inadmissible. He also asserts that the trial court should not have admitted testimony regarding confrontations he had with the victim regarding the pending drug case.

Rule 404(b) provides as follows:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
> (1) The court upon request must hold a hearing outside the jury's presence;

-10-

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Generally, Rule 404(b) is a rule of exclusion, but there are exceptions to this rule. See State v. Parton, 694 S.W.2d 299 (Tenn. 1985); State v. Bunch, 605 S.W.2d 227 (Tenn. 1980). Exceptions to the rule of exclusion include when the evidence is relevant to the motive, identity, or intent of the defendant, to show the absence of accident or mistake, to prove opportunity, or to show a common scheme or plan. Id. at 229. The defendant concedes, and this court agrees, that the trial court substantially complied with the requirements of Rule 404(b)(2) in determining the admissibility of these prior acts. When a trial court substantially complies with the requirements of Rule 404(b), the trial court's admission of evidence will not be reversed absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). The crux of the defendant's argument appears to be that the danger of unfair prejudice outweighed the probative value of the evidence under Rule 404(b)(4).

The state filed a motion in limine to establish the admissibility of the evidence related to the drug raid and pending drug prosecution, including the alleged threatening statements made by the defendant toward the victim. At the pretrial hearing, the state argued that the evidence was admissible to establish the defendant's motive to kill the victim. At the motion hearing, the defendant acknowledged that the evidence would come in to establish motive but "basically we're just looking to go ahead and set the parameters now" so the defendant would know what to anticipate at trial. The trial court ruled that evidence of the drug raid, drug charges and later threats would be admissible without getting into the detailed specifics of what was found at the drug raid. In ruling on the admissibility of the evidence, the trial court stated:

All right. State's motion to introduce 404(b) evidence sustained. Okay, within those parameters. . . . But generally the rule calls for me to find clear and convincing evidence of all this stuff, but since you both agree on some of the basic facts, not all the facts but the basic facts, then I find that the prejudicial — the probative value outweighs the prejudicial effect when it comes to motive in the 404(b) evidence.

After the court ruled, defense counsel acknowledged "[w]ell, we'll agree that he can bring in that limited [evidence] which the Court limited him to."

The state argues that many of the issues raised regarding the admission of prior bad act evidence in this case are waived for failure of the defendant to cite to the record or authority. Tenn.

Ct. Crim. App. R. 10(b). The state also argues that some of the prior bad act evidence was not objected to at trial and should be deemed waived. Tenn. R. App. P. 36(a). We acknowledge numerous deficiencies in the defendant's brief with respect to citations to the record and authority, as well as instances of testimony of prior bad acts that occurred without objection. All of these deficiencies would provide a basis for waiver of the issues. Nevertheless, after a careful review of the record and consideration of the arguments on appeal, we conclude that the issues regarding admission of prior bad acts are without merit.

The prior bad acts were highly probative of the motive of the defendant and, likewise, of the identity of the person who committed these offenses. The probative value of this evidence was not outweighed by the danger of unfair prejudice. While noting that in some respects the defendant acquiesced to the admission of the evidence during the pretrial hearing, we conclude that the trial court properly admitted the evidence regarding the drug raid, pending drug prosecution, arguments between the victim and defendant, and threats made to the victim and others by the defendant.

To the extent that the defendant now complains that the trial court failed to give a limiting instruction regarding the consideration of this evidence by the jury, we agree with the state that the record simply refutes this claim. Although the trial court did not specifically instruct the jury subsequent to the presentation of the evidence, the jury instructions do include guidance for the consideration of all prior bad act evidence and limit such consideration as relevant to the motive and intent of the defendant.

Also, to the extent that the defendant argues that the trial court "failed to control the questioning" of Mark Calhoun, allowing leading questions and improper emphasis regarding the defendant's threats to both the victim and Calhoun, we note that the defendant objected to leading questions and the trial court admonished the state for utilizing leading questions on direct. We also note that despite the fact that the trial court made no finding that Calhoun was a hostile witness, he was arguably a reluctant witness. See Tenn. R. Evid. 611(c). We further conclude that any error in the direct examination Calhoun was harmless.

*Improper Impeachment By Extrinsic Evidence*

The defendant contends that the trial court improperly allowed the state to impeach their own witness, Latasha Hinton, by her alleged inconsistent statement made to her sister, Seneka Gaines. The defendant contends that Gaines testimony was improper because it was hearsay evidence and because Hinton was not confronted with this extrinsic proof and given the opportunity to explain or deny the statement in accordance with Tennessee Rules of Evidence 613. The state argues that the trial court limited the use of the testimony to impeachment of Hinton and that the conflicting testimony was "so convoluted and confusing" that it provided "grist for the defense in closing [argument]."

Rule 613(b) of the Tennessee Rules of Evidence provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an

opportunity to explain or deny the same." In this case, the state impeached their own witness, Latasha Hinton, who testified that she was standing in the hallway of the apartment when she was shot by the defendant. When asked if she ever told her sister that she was standing in the kitchen when the defendant broke down the door and began shooting, she denied making such a statement. The state then called her sister, Seneka Gaines, who ultimately testified that Hinton told her that she was in the kitchen when she was shot.[2] The trial court instructed the jury that "it's very important that you understand that this testimony is only for impeachment purposes and not for the truth of the matter because it's otherwise hearsay." The record refutes the defendant's claim that Hinton was not confronted with the statement before the extrinsic proof of it was presented through Gaines. This issue is without merit.

*Failure to Charge Jury Regarding Favorable Treatment*

The defendant contends that the trial court erred by not instructing the jury regarding certain witnesses' hopes of favorable treatment in exchange for their testimony. He contends that the trial court should have instructed the jury regarding favorable treatment in accordance with the Pattern Jury Instructions of the District Judges Association of the Eleventh Circuit which states:

> The testimony of some witnesses must be considered with more caution than the testimony of other witnesses.
> For example, a paid informer, or a witness who has been promised that he or she will not be charged or prosecuted, or a witness who hopes to gain more favorable treatment in his or her own case, may have a reason to make a false statement because he wants to strike a good bargain with the Government.
> So, while a witness of that kind may be entirely truthful when testifying, you should consider that testimony with more caution than the testimony of other witnesses.

The state argues that the defendant has waived this issue for failure to cite to the record or authorities. Tenn. Ct. Crim. App. 10(b). We agree with the state that the defendant's argument relating to this issue is insufficient and should be deemed waived. Also, we cannot glean anywhere in the record where a request for such an instruction was made. This provides another basis for waiver. Tenn. R. App. P. 36(a). Furthermore, we conclude that the facts in this case would not warrant such an instruction and that the proposed instruction is an improper statement of the law as it relates to credibility and favorable treatment of witnesses. The mere hope of favorable treatment, without the attendant promise or agreement of leniency, does not rise to the level of warranting a special instruction on credibility and the witnesses were sufficiently cross-examined regarding any hopes for favorable treatment that may have influenced their testimony. Any effects these hopes may have had on their credibility were properly before the jury for consideration in arriving at the verdict.

---

[2] We note that Gaines initially stated that Hinton told her she was in the living room and Tuggle was in the kitchen. Gaines then corrected herself and stated that Hinton told her she was in the kitchen and Tuggle was in the living room. Gaines also testified that Hinton identified the defendant as the perpetrator on the night of the offense.

CONCLUSION

Upon full consideration of the record and arguments of counsel, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE